FILED

NOV 2 1 2011

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

### MODESTO DIVISION

In re

MICHAEL KENNETH NEMEE and
MICHELLE SEOBHAN McKEE NEMEE,

             Debtors.

Case No. 09-93249-E-11

MICHAEL KENNETH NEMEE and
MICHELLE SEOBHAN McKEE NEMEE,

             Plaintiffs,

v.

COUNTY OF CALAVERAS,

             Defendant.

Adv. Proc. No. 09-9088

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM OPINION AND DECISION

This Adversary Proceeding presents the court with competing contentions by Michael and Michelle Nemee, the Plaintiff/Counter-Defendants ("Plaintiffs"), the Chapter 11 Debtors, and the County of Calaveras, California, the Defendant/Counter-Claimant ("County") as to the proper interpretation and application of the Calaveras County Zoning Ordinances. The real property at issue consists of a 160-acre parcel and 120-acre parcel, both in Calaveras County

("The Property") which are owned by the Plaintiffs and are property of their bankruptcy estate.[1] On this bankruptcy estate property, the Plaintiffs have constructed and are operating a commercial 18-hole golf course through Trinitas Enterprises, LLC, a limited liability company they own, which is also property of the bankruptcy estate. Plaintiffs assert that the development and operation of a commercial golf course on The Property are permitted as "Agritourism" under the Calaveras County Zoning Ordinances. Alternatively, if the commercial 18-hole golf course is not Agritourism, Plaintiffs assert that the County is equitably estopped from asserting that the use and operation of this commercial golf course by the Plaintiffs violates the Zoning Ordinances. The County has not only answered the Second Amended Complaint denying the allegations and requesting judgment in its favor, but also filed a counterclaim for injunctive relief from this court to enjoin the alleged violations of the County Zoning Ordinances.

Prior to and during the pendency of this litigation, the development and use of The Property as a commercial 18-hole golf course was the subject of County review and nonjudicial political proceedings before the Calaveras County Board of Supervisors. When that nonjudicial process failed to produce a satisfactory resolution for the Plaintiffs, they continued with the prosecution of this Adversary Proceeding, which concluded with a three-day court trial. Through this trial the parties presented extensive evidence concerning the decade-long odyssey involving the

---

[1] Calaveras County, California Assessor Parcel Nos. 50-052-41 and 050-052-42.

Plaintiffs, the County, investors, members of the golf club operated on The Property, and other persons who envisioned a golf course and destination resort known as the Ridge at Trinitas on The Property.[2]

### PROCEDURAL HISTORY OF THE ADVERSARY PROCEEDING, FEDERAL COURT JURISDICTION, AND FINAL DETERMINATION BY THE BANKRUPTCY COURT

This Adversary Proceeding was originally commenced by Plaintiffs in the California Superior Court, Calaveras County. The original state court complaint was filed on May 15, 2009, with a first amended state court complaint filed on September 15, 2009. On October 7, 2009, the Plaintiffs commenced their voluntary Chapter 11 case in this court.[3] The Plaintiffs filed a second amended complaint in the state court action on December 7, 2009 ("Second Amended Complaint"). While a demurrer to the Second Amended Complaint was pending, Plaintiffs removed the state court action to this court pursuant to 28 U.S.C. § 1452 on December 29, 2009. The County then filed a motion with this court to remand the action back to the state court or abstain hearing the issues in this Adversary Proceeding. The County also filed a motion for the remand of or abstention by this court for a second adversary proceeding which Plaintiffs removed to this court.[4] In the second

---

[2] Though the development concept for The Ridge at Trinitas is much greater than an 18-hole golf commercial golf course, the matter before the court does not seek a determination as to the proposed subdivision, lodge, spa, and other amenities which the Plaintiffs sought to develop on The Property in Calaveras County.

[3] Eastern District of California Case No. 09-93249.

[4] Eastern District of California, Adversary Proceeding No. 09-9089

3

removed action, Plaintiffs sought a writ of mandate against the County relating to their land use application for The Property.[5] The court granted the motion to remand the adversary proceeding for a writ of mandate, in large part based on the representations by the County that the matter was ready to proceed to trial in the state court, that a CEQA-experienced judge was assigned to the state court proceedings, and that matter would be tried on April 10, 2010, if remanded to the state court.[6] This court denied the motion to remand this Adversary Proceeding, determining that the bankruptcy court was the proper forum to address the issues concerning the use and reorganization of The Property in the Chapter 11 bankruptcy estate.[7]

Following the decision not to remand or abstain from this Adversary Proceeding, the County filed a motion to dismiss the Second Amended Complaint. The court granted the motion and dismissed all claims except (1) for declaratory relief that the commercial 18-hole golf course was permitted as "Agritourism" on The Property and (2) that the County was equitably estopped from asserting that the 18-hole commercial golf course was not permitted as Agritourism on The Property.

---

[5]   The writ of mandate sought relief under the California Environmental Quality Act ("CEQA") and a declaration that County employees acted in violation of CEQA and state planning laws. The Plaintiffs requested that the court order the County to complete an environmental impact report ("EIR"), and order which employees and consultants of the County would be permitted to work on the EIR.

[6]   Though remanded, this state court action has not gone to trial and neither party asserted that any determinations made in that action resolved issues in this Adversary Proceeding.

[7]   Dckt. 34, 38.

The County then filed its Answer denying the allegations for the two remaining causes of action in the Second Amended Complaint and requesting that the court enter judgment on all claims against the Plaintiffs.  In addition, the County filed a counterclaim for injunctive relief from this bankruptcy court to enjoin the Plaintiffs from using The Property as a commercial golf course because such development and use violates of the Calaveras County Zoning Ordinances and thereby constitutes a public nuisance.

**Federal Court Jurisdiction and Bankruptcy Court Proceedings**

Jurisdiction for this matter arises under 28 U.S.C. § 1334(b), which provides for original but not exclusive federal court jurisdiction for all civil proceedings arising under Title 11 (the Bankruptcy Code), or arising in or related to cases under Title 11. Federal court jurisdiction is exclusive for all property, wherever located, of a debtor as of the commencement of the case and of property of the estate.  28 U.S.C. § 1334(e)(1).  A party may remove a state court action to federal court if federal jurisdiction exists under 28 U.S.C. § 1334.  *See* 28 U.S.C. § 1452.

Congress vests in the bankruptcy courts, for matters referred by the district court, jurisdiction for all proceedings arising under Title 11, or arising in or related to a case under Title 11. The United States District Court for the Eastern District of California has referred to this bankruptcy court all matters arising under, arising in or related to Title 11 as authorized in 28 U.S.C. § 157(a).[8]  This bankruptcy court may thereon enter final judgments and orders on all cases under Title 11, core proceedings

---

[8]   United States District Court, Eastern District of California, General Orders 182 and 223.

5

arising under Title 11 or arising in a case under Title 11, and non-core proceedings to which the parties have consented, with all such rulings being subject to appellate review.   28 U.S.C. § 157(b)(1), (2), and (c)(2).

The issues in this Adversary Proceeding relate to the character and use of a commercial 18-hole golf court located on property of the Plaintiffs' bankruptcy estate.   Congress has defined core proceedings in a non-exclusive manner to include (1) matters concerning administration of the estate, (2) order to turn over property of the estate, (3) determinations of the extent, validity, and priority of liens, (4) orders approving the use or lease of property of the estate, and (5) other proceedings affecting the liquidation of assets of the estate or the adjustment of the debtor-creditor relationship.[9] These matters arising in and under the Bankruptcy Code for management and administration of the bankruptcy estate and reorganization of a bankruptcy estate are essential parts of the federal bankruptcy scheme for reorganization as enacted by Congress.   The specific issues presented to this court seek a determination of rights and interests in The Property (development and use as a commercial golf course), the ongoing operation of the commercial business on The Property as part of the bankruptcy estate, the rights and interests of the County concerning the use of this property of the bankruptcy estate, and the ability of the Plaintiffs to use this property of the bankruptcy estate and business though a Chapter 11 bankruptcy reorganization.   This reorganization may include the continued

---

[9]   28 U.S.C. § 157(b)(2)(A), (E), (K), (M), and (O).

operation of The Property as a commercial golf course, ownership and operation of Trinitas Enterprises, LLC, and liquidation of The Property, or realization of the value of The Property and operating business either through a sale or generating payments from such operations under a confirmed Chapter 11 Plan. As such, the matters presented to this court constitute core proceedings.

In the Counterclaim filed by the County, it is asserted that jurisdiction exists and is invoked by the County pursuant to 28 U.S.C. §§ 1334 and 157. The County seeks injunctive relief from this bankruptcy court, to be determined and granted based upon determination of the same issues of law and fact as asserted in the Second Amended Complaint. The facts and law for the Second Amended Complaint and Counterclaim are the same, with the determination of such facts and law necessary to grant the relief requested by each party. The County has affirmatively and voluntarily invoked the jurisdiction of this bankruptcy court pursuant to 28 U.S.C. §§ 1334 and 157, and has not only requested that this court deny the relief requested by the Plaintiffs, but has filed its Counterclaim for this court to enjoin the Plaintiffs from using this property of the bankruptcy estate as a commercial golf course. To the extent that this is a related matter under 28 U.S.C. § 157, all parties to this Adversary Proceeding have consented to and requested that this bankruptcy court hear and determine all of these matters, each affirmatively invoking the jurisdiction and power of this bankruptcy court. 28 U.S.C. § 157(c)(2).

Federal court jurisdiction existing for this Adversary Proceeding and this bankruptcy court having the authority to issue a final judgment thereon, the court makes the final ruling on all

7

1  issues in this Memorandum Opinion and Decision, and shall enter its

2  judgments on the Second Amended Complaint and the Counterclaim.

**FACTUAL FINDINGS CONCERNING THE ACQUISITION, USE, AND DEVELOPMENT
OF THE PROPERTY,  CONDUCT OF THE DEBTORS
AND COUNTY CONCERNING THE DEVELOPMENT AND USE OF
THE PROPERTY AS A COMMERCIAL GOLF COURSE**

**Acquisition and Construction of Golf Course**

7      The Plaintiffs began acquiring parcels of real property

8  located in Calaveras County, California, in 2001, which include The

9  Property.  Prior to that time, the Plaintiffs lived in Northern

10  California and owned property on which Michael Nemee constructed

11  several golf holes for his private, personal use.  At the time the

12  parcels were purchased in Calaveras County, The Property was being

13  used as a cattle ranch and olive orchard.  Though planted with

14  trees, the olive orchard was not producing a marketable crop.  The

15  Plaintiffs purchased several parcels, obtained lot line

16  adjustments, transferred title to portions of these properties, and

17  had other persons added to title on portions of these properties.

18  These include the 160-acre and 120-acre parcels which are zoned for

19  agriculture and on which the commercial 18-hole golf course has

20  been constructed and is being operated.

21      When The Property was acquired by Plaintiffs, it was zoned as

22  Agriculture Preserve, which is limited to property that is subject

23  to a Williamson Act Contract, thereby restricting the uses of and

24  the tax basis for such Agriculture Preserve properties.[10]  In 2001,

25  the Plaintiffs commenced a survey of The Property, which resulted

26  in the County receiving complaints of potential unauthorized

27

28

_____

[10]   Cal. Gov. Code § 51200 *et. seq.*

8

development on The Property.  Dan Hendrycks, a planner with the County, wrote a letter dated August 9, 2001, informing the Plaintiffs that the County had received complaints that the Plaintiffs were constructing a golf course on The Property. Mr. Hendrycks states in his letter that a golf course, whether for public or private, personal use, was not allowed on property zoned as Agriculture Preserve under the County's ordinances in 2001.

Michael Nemee sent a written response, dated August 14, 2011, directing Mr. Hendrycks to speak with Tom Jeffries (an engineer hired by the Plaintiffs) concerning The Property and any development thereon.  Further, Michael Nemee asserted in his letter that he had spoken with Jerry Howard, the Calaveras County Agricultural Commissioner, concerning the agricultural uses for The Property.  Michael Nemee did not discuss or disclose in his letter any ongoing or intended construction of a golf course on The Property.

With respect to the referenced conversation with Jerry Howard, Michael Nemee testified at trial only that Jerry Howard told him that Mr. Howard did not believe the construction of a golf course for private, personal use by the property owner was a violation of the Williamson Act.   Michael Nemee did not testify that Jerry Howard told him that a golf course was a permissible use of The Property under the Calaveras County Zoning Ordinances.   Jerry Howard testified at trial that he had one meeting with Michael Nemee at The Property, saw an existing olive orchard and the construction of golf holes which he understood from Michael Nemee would only be for the private, personal use of the Plaintiffs. Further, Jerry Howard testified that any discussion that he had

with Michael Nemee concerning use of The Property as a private, personal use golf course were only in the context of Williamson Act restrictions and not the Calaveras County Zoning Ordinances. Jerry Howard further testified that Zoning Ordinance issues were not within his jurisdiction as the Calaveras Agricultural Commissioner and he would not purport to make statements concerning compliance with the Zoning Ordinances.

Based on the evidence before the court, Jerry Howard's communications with Michael Nemee were limited to Plaintiffs constructing a private, personal use a golf course on The Property, and that Mr. Howard did not see such private, personal use as conflicting with the Williamson Act. At that point in time, Michael Nemee represented to Jerry Howard that any golf hole construction work being done on The Property was solely for the private, personal use of the Plaintiffs as the land owners.

By a letter dated August 20, 2001, Tom Jeffries of Jeffries Engineering, the agent of the Plaintiffs, responded to Mr. Hendrycks' correspondence concerning the complaints. In this letter, Mr. Jeffries affirmatively states that the Plaintiffs contemplated installing a golf course in the future, but no on-site work had been done to install or develop such use. Further, the Plaintiffs had crews surveying The Property to accurately depict boundaries and other natural features. Though no golf course construction was disclosed, Mr. Jeffries informed Mr. Hendrycks that the Plaintiffs wished to install a vineyard, and to do so would require that a portion of The Property be graded.[11]

_____

[11]   No evidence was presented to the court of the construction of a vineyard or any grading work done for a

10

Mr. Jeffries further asserts in his letter that the County has not presented "any evidence of the construction of a golf course" and affirmatively represents for the Plaintiffs that a golf course is not under construction.  This stands in contrast to the testimony of Mr. Nemee and Mr. Howard of their conversation, which pre-dates Mr. Jeffries August 20, 2011 letter, that the Plaintiffs were in the process of constructing a private, personal use golf course on The Property.

The August 14, 2001 letter from Mr. Nemee and the August 20, 2001 letter from Mr. Jeffries are typical of what has been shown to be recurring conduct of the Plaintiffs in dealing with the County. First, the Plaintiffs take a portion of comments by one County representative and attempt to utilize it out of context to advance their desired development of The Property.  Next, the Plaintiffs and their representative issue carefully worded statements which fail to fully or accurately disclose actual facts concerning the development of The Property and Plaintiffs' conduct.  In the Summer of 2001, the Plaintiffs have their agent Mr. Jeffries stating to the County that no construction is taking place for a golf course on-site.  However, Jerry Howard testifies that not only had he observed a golf course being constructed, but that he and Michael Nemee discussed the then ongoing construction of a private, personal-use golf course for the Plaintiffs.  The court finds the statements for Plaintiffs made by Mr. Jeffries for his principals in this letter to be creatively misleading at best and intentionally false at worst.

---

vineyard.  The grading work done by the Plaintiffs was for construction of the 18-hole commercial golf course.

11

The Plaintiffs' activities continued and by 2003 the Calaveras County Building Department became involved with respect to the ongoing construction and development of The Property.  By a letter dated August 27, 2003, Ray Waller of the Calaveras County Building Department notified the Plaintiffs that the County had received numerous complaints about a massive grading project on The Property.   Mr. Waller notified the Plaintiffs that they were required to obtain and submit engineering and grading plans pursuant to the Calaveras County Ordinances.  With respect to this grading activity and the development of  The Property, Michael Nemee's testimony establishes that as of August 2003, the Plaintiffs were in the process of constructing the commercial 18-hole golf course, which is on The Property today.[12]   Further, Michael Nemee testified that starting in 2001, he had begun the drawings to develop The Property for an 18-hole golf course.  The court finds that the Plaintiffs intended, as early as 2001, to construct an 18-hole golf course on The Property.  Further, that this was done as an intended larger commercial development including a lodge, clubhouse, restaurant, bar, and golf academy, not one for the private, personal use by the Plaintiffs as the

---

[12]   The court uses the term "commercial 18-hole golf course" as one in which the Plaintiffs were engaged in an economic enterprise to generate revenues or other remuneration from the operation of the golf course for use by persons other then the Plaintiffs as the owners of The Property.  The testimony provided is that the Debtors have been charging fees to the public and selling memberships for the use of the golf course, as well for tournaments open to the public or for closed groups.  The phrase "private, personal use" of a golf course means the actual use by the two Plaintiffs personally or with their friends and family for which no monetary or other remuneration is obtained, either directly or indirectly, by the Plaintiffs for such use.

12

owners of The Property.[13]

On October 1, 2003, Michael Nemee sent a letter to Wes Hodgson, a Calaveras County Planning Commissioner. The letter does not disclose the then ongoing development of the 18-hole golf course on The Property, but only that the Plaintiffs sought a change in the Calaveras County Zoning Ordinances to allow golf courses as a conditional use for any property zoned Agriculture Preserve. This letter dated October 1, 2003, demonstrates that the Plaintiffs clearly understood that a golf course was not permitted on The Property under the then existing Calaveras County Zoning Ordinances. Though this letter is on Michael Nemee's letterhead, is signed by Michael Nemee, and sent by Michael Nemee intending to communicate specific information to Mr. Hodgson, Michael Nemee disavowed portions of his statements in the letter. Michael Nemee testified at trial that while he signed the October 1, 2003 letter, it had been prepared for him by one of his professionals and that he did not read the letter before signing it. Several times during trial Mr. Nemee attempted to disavow knowledge of information in correspondence or documents signed and sent by him or by his professionals, upon which others persons and the County were to rely, by testifying that he did not read the correspondence or documents before signing them. The court does not find such testimony by Michael Nemee credible.

---

[13] The court has not found evidence to support a contention that the Plaintiffs intended to develop and use the 18-hole golf course for their private, personal use. Further, as borne out by the creditors in this case and the loans obtained by the Plaintiffs, no evidence has been presented that the Plaintiffs had or have the economic resources to develop and construct an 18-hole golf course on The Property for their private, personal use.

13

It is clear that the Plaintiffs were intimately involved in the development of The Property, the construction of the golf course, and the intended development of The Ridge at Trinitas as a destination resort.[14]  The court is not persuaded by Michael Nemee's testimony and the other evidence submitted that the Plaintiffs were unaware of the representations which they, directly and through their professionals, were making to the County, Community Bank of San Joaquin, and other persons.[15]

By November of 2003, the Plaintiffs were notified by the Calaveras County Code Compliance Unit that an administrative hearing had been set to address alleged Zoning Code violations on The Property.  The alleged violations focused on grading being done on The Property by Plaintiffs without a permit.  At the request of a member of the Board of Supervisors, the administrative hearing was removed from the agenda so that the County and the Plaintiffs could attempt to resolve the issue.  In response to the notice of administrative hearing, Robert Bliss of Jeffries Engineers, Inc., an agent of the Plaintiffs, sent a letter dated November 20, 2003,

---

[14]  Michelle Nemee, the other Plaintiff, chose not to testify at trial.  Her allegations in the Second Amended Complaint are the same as Michael Nemee's, and she has relied upon and presented testimony of witnesses and evidence through her attorney and co-plaintiff.

[15]  As developed in this decision, based on the evidence presented the court finds the Plaintiffs to be sophisticated business persons who engaged the services of multiple professionals to implement the Plaintiffs' economic goals; and conceived, developed, and actively participated in a complex real estate development, securities, and economic enterprise.  The Plaintiffs created the idea for The Ridge at Trinitas, drawings for the golf course, financing, issuance of securities for golf memberships, and Michael Nemee performed some of the physical construction of the golf course.

to Ray Waller at the Calaveras Building Department.  In this letter Robert Bliss affirmatively states that the work being done is "more of a clearing and brushing project to develop a private golf course."  Mr. Bliss further states that there are only a small amount of cuts and fills to construct greens and tees, isolated to only 75 acres within the 400 acres owned by the Plaintiffs.[16] Finally, Robert Bliss concludes that a grading plan is not warranted because of the "small isolated nature" of the grading contained well within the boundaries of the 400 acres.  As actual events demonstrate, these statements by the Plaintiffs' representative are again creatively misleading at best and intentionally false at worst.[17]

The issue of the alleged violation was dropped due to a determination by department heads at the County that the represented limited nature of the grading being done on The Property,  zoned for agriculture, did not require a permit.  No determination was made or represented that the purpose for which the grading was being done was allowable under the Calaveras County Zoning Ordinances.

///

In July of 2004, the Plaintiffs filed an application with Calaveras County for a General Plan Amendment, Zoning Amendment, and Tentative Subdivision Tract Map for The Property.  In this Application the Plaintiffs sought to subdivide the 160-acre parcel

---

[16]  The commercial 18-hole golf course constructed by the Plaintiffs is located on 380 acres of The Property.

[17]  Tom Jeffries, the Plaintiffs' agent, repeats these statements in his letter of January 9, 2004, to Ray Waller at the Calaveras County Building Department.

15

of The Property to create twelve 5-acre parcels, one 98.8-acre parcel, and to do minor grading for house pads and roadways. The application makes no reference to a golf course, and the attached maps of the proposed development do not show a golf course on The Property. Though not shown on the map with this application, Michael Nemee testified that at the time of making this application the Plaintiffs actually intended to construct six golf holes for the homeowners, who they expected to be family members and friends. This testimony as to only six golf holes is inconsistent with the drawings and intentions of the Plaintiffs to develop an 18-hole golf course on The Property. The July 2004 application identifies Jeffries Engineers and Susan Larson as the Plaintiffs' agents for this application. By letter dated July 7, 2004, Don Ratzlaff, who was a Calaveras County Planner II, notified Tom Jeffries of deficiencies in the application, that it must be amended, and it will not be processed due to it being incomplete.

By August of 2005, Ray Waller, of the Calaveras County Building Department, communicated in an email his opinion to Robert Sellman, the then Calaveras County Interim Planning Director, and other county personnel, that the Plaintiffs could construct a private golf course on The Property for their personal use and use of their friends. Mr. Waller makes no reference in his email to construction of a commercial golf course on The Property, and expressly states that his personal opinion is limited to a private, personal-use golf course by owners of The Property. While this was Ray Waller's opinion, Robert Sellman testified that he disagreed with Mr. Waller, and that even a private, personal-use golf course was not permitted on property zoned for agriculture. While

16

Mr. Waller was discussing a private, personal-use golf course with the Plaintiffs, in a letter to Robert Sellman dated February 7, 2005, the Plaintiffs communicated their larger development plans for The Property.  This larger development included an 18-hole golf course with 10,000 to 12,000 rounds per year; private golf tournaments; private golf lessons; two-story, 18,000-square-foot clubhouse/olive tasting facility; bar and grill; banquet facilities; sale of golf equipment; 22,000-square-foot lodge with 30 guest rooms; swimming pool; exercise room; spa; and a facility to be used as dormitory housing for group lessons (also described as an academy in Michael Nemee's testimony).   This was to be placed on 440 acres of property owned by the Plaintiffs and other family members.

**Loans Obtained by the Plaintiffs From Community**
**Bank of San Joaquin**

In September of 2002, the Plaintiffs sought and obtained a loan from Community Bank of San Joaquin (also referenced as "Bank").   This loan was in the amount of $370,000.00 and is evidenced by a Note dated September 9, 2002.[18]   The Disbursement Authorization Request signed by the Plaintiffs, which is included as part of this loan documentation, states that the primary purpose of the loan is for "Business (including Real Estate Investment)".  The specific purpose is stated by Plaintiffs in the Disbursement

---

[18]     Exhibit III is the August 13, 2002 County Bank of San Joaquin Credit Authorization Memorandum for the Plaintiff's then existing loan with the Bank. In addressing the purpose of the then existing loan in 2002, the Memorandum states, "As mentioned previously, CBSJ [Bank] provided funds to the Nemee's [sic.] to assist with the purchase of the land.  The property that was purchased is to be developed in the next several years into a golf course."

17

Authorization Request to be "Refinance of bare land, to be developed to a golf course."   Based on the testimony of Jane Butterfield, president of Community Bank of San Joaquin, if the Plaintiffs had been obtaining a personal loan, then it would have so stated on the Disbursement Authorization Request.

Mr. Nemee's testimony at trial was that he had not bothered to read this part of the note and loan documentation stating that the purpose of the loan was for business, the development and construction of a golf course.  The court finds that such testimony is not credible and is inconsistent with the attention to detail exhibited by Plaintiffs in advancing the development of this commercial 18-hole golf course, their involvement in the development of The Property, and Plaintiffs' communications (directly and by their professionals) made during the ten-year period from acquisition of The Property through this trial.   The court finds that as early as 2002 the Plaintiffs were obtaining business loans for construction of a commercial 18-hole golf course, which was not intended for the personal, private use of the Plaintiffs.

The Plaintiffs obtained a line of credit, their second loan, dated August 25, 2005 in the amount of a $500,000.00.  The primary purpose of this loan is stated on the Reimbursement Request and Authorization signed by the Plaintiffs to be "Business (including real estate development)," with the specific purpose stated as, "Capital for construction, and related expenses of Trinitas Golf course."   This credit line was used to repay a $300,000.00 obligation owed by the Plaintiffs.  A third loan obtained by the Plaintiffs is evidenced by a promissory note dated January 27,

2006, in the amount of $1,300,000.00.[19]    This loan was used in part to pay $503,477.37 for the obligation owed on the August 22, 2005 credit line.    The Disbursement Request and Authorization signed by the Plaintiffs states that the primary purpose of the loan is "Business (including Real Estate Investment), and the specific purpose to "Provide capital for construction, and development related expenses for Trinitas Golf Course." The $1,300,000.00 loan was modified by a change in terms agreement dated December 28, 2006, increasing the loan amount to $1,600,000.00.[30]    The purpose of the loan continued to be for construction and payment of development expenses for the Trinitas Golf Course.

In the Fall of 2006, before the final loan modification and $300,000.00 of additional credit, the Community Bank of San Joaquin was concerned with the slowness of the Plaintiffs in advancing their development of The Property and application for the land use changes with Calaveras County.    A meeting was held between Michael Nemee and Bank representatives on November 9, 2006.    Michael Nemee requested that Stephanie Moreno, the then Community Development Director for Calaveras County, attend the meeting.    While all parties agree that Ms. Moreno attended the meeting, there are significantly different versions as to the substance and alleged purpose of her attendance.  Michael Nemee testified that Ms. Moreno attended the meeting to assist Plaintiffs in getting additional loans from the Bank and an extension of the due date for the then

---

[19] Steve Nemee, Michael Nemee's parents, and Patricia Nemee are added co-borrowers on this note.

[30] Steve Nemee and Patricia Nemee signed this extension agreement and remain as co-borrowers on the note.

19

existing loan.  Further, that Plaintiffs relied upon statements by Ms. Moreno that their land use application was going to be approved by the County.

From the testimony presented, the court finds that Michael Nemee invited Ms. Moreno to attend because Plaintiffs thought it would enhance their ability to convince the Bank to extend the due date on the loan and give the Plaintiffs the additional credit they desired.  Michael Nemee's testimony and arguments attempt to paint a picture that but for Ms. Moreno attending the meeting, the Plaintiffs would not have obtained an additional loan from Community Bank of San Joaquin in the amount of $300,000.00. Therefore, if Plaintiffs had not obtained the loan, they would not have proceeded with investing millions more in the development of the golf course.  Michael Nemee's testimony at trial was that through 2006 the Plaintiffs spent $3,345,390.00 in developing the golf course on The Property.  The court finds that the additional $300,000.00 of credit extended following the November 9, 2006 meeting between Michael Nemee and the Bank was not the cause of the prior and subsequent expenditures of monies by the Plaintiffs in construction of the golf course and development of The Property.

Michael Nemee's testimony and argument stand in stark contrast to the testimony of Ms. Moreno and the other persons at the meeting.  Robert Puchenelli, then a Business Development Officer for Community Bank of San Joaquin, attended the November 9, 2006 meeting for the Bank.  He testified that the Bank was concerned about the delays in the project and development of the golf course. He stated that at the meeting Ms. Moreno described the zoning application process and what she was doing to keep the application

20

moving.   Mr. Puchenelli further testified that the Bank knew in 2005 that the golf course was under construction, and that doing so was unusual because the Plaintiffs did not have the real-property entitlements to develop the golf course.   Further, Mr. Puchenelli and the Bank knew that the Board of Supervisors must approve any zoning or land use application for the golf course to be legal, and that such a decision did not rest with Ms. Moreno or County staff. Mr. Puchenelli's testimony supports this court finding that the Plaintiffs knew that they had to obtain approval of their land use application from the Board of Supervisors to obtain the entitlements for their existing and future development and use of the 18-hole golf course to be legal under the Calaveras County Zoning Ordinances.[31]

Robert Daneke, who was employed at Community Bank of San Joaquin in 2006, testified that he also attended the November 9, 2006 meeting with Mr. Nemee, other bank representatives, and Ms. Moreno.[32] At the time of the meeting the Plaintiffs had already borrowed $850,000.00 and were seeking an additional $300,000.00. Mr. Daneke's testimony was that Ms. Moreno provided background

---

[31]   The Plaintiffs assert that Ms. Moreno said that her predecessor had mishandled the processing of the Plaintiffs' land use application and that the County faced legal exposure for it. In addition to this contention being in dispute, it has no bearing on the Plaintiffs acquiring loans and developing the golf course before they obtained a changing for the zoning on The Property.   Additionally, there is testimony that the potential "legal exposure" could have been in connection with an EIR not being adequately prepared to sustain a legal challenge if raised by members of the public, not exposure to the Plaintiffs.

[32]   Mr. Puchenelli and Mr. Dandke were presented as witnesses by the Plaintiffs.   Jane Butterfield, the president of Community Bank of San Joaquin, was called by the County as a witness.

about the application process and that she believed that the EIR would be processed in a timely manner.  Mr. Daneke confirmed that based on their discussions, he and everyone at the meeting, including Michael Nemee, knew that the Board of Supervisors had to approve the application and that the application had not yet been approved.

An excerpt from a Credit Authorization Memorandum for Community Bank of San Joaquin prepared by Mr. Daneke was introduced by the Plaintiffs as Exhibit 38.  The County introduced as Exhibit KKK a complete copy of the Bank's Credit Authorization Memorandum dated December 14, 2006.  This Credit Authorization Memorandum is a document maintained by the Bank in its ordinary course of business, with additions made over time by the credit officers, and contains a history of information provided to the Bank concerning the Plaintiffs' loan transaction.  The Credit Authorization Memorandum, and as confirmed by Mr. Daneke, documents that the Bank proceeded with the loan under the belief that the golf course being developed by the Plaintiffs was illegal absent the zoning application being approved by the Board of Supervisors.  The granting of a further loan was based on the then existing value of The Property, not the value based on there being a legal golf course constructed on The Property.  Finally, the Bank acknowledged that the Plaintiffs proceeding with the development of the golf course before obtaining approval of the land use application was unusual for this type of loan, and the illegal construction was a "key risk" for the Bank.

Jane Butterfield, President of Community Bank of San Joaquin, testified as to the Bank's dealing with the Plaintiffs following

the November 9, 2006 meeting.  Though not present at the meeting, Ms. Butterfield reviewed the Credit Authorization Memorandum because the amount of credit exceeded the lending limit of the loan officer.  From her testimony and other evidence, the court finds that as of the November 9, 2006 meeting the Bank was developing an exit strategy from this loan, other than a bank liquidation of The Property.  The Bank was not going to finance the entire development project, but believed that once the EIR was completed, a larger lender would provide sufficient financing for the project, pay off the Bank's loan, and carry the development though the final map with the County.

From the evidence present, the court finds that Ms. Moreno did not represent to anyone at the November 9, 2006 meeting, or anytime prior to or thereafter, that the Plaintiffs' zoning and land use application would be approved by the Board of Supervisors. Further, everyone involved in the meeting with the Bank, including the Plaintiffs, clearly understood that the necessary land use application had to be approved by the Board of Supervisors, not Ms. Moreno.  Neither the Plaintiffs nor the Community Bank of San Joaquin relied upon any representations by Ms. Moreno, or any other representative of the County, as to the ultimate approval of the application in proceeding with any additional loans or further development of The Property.  The court does not find credible the Plaintiffs contention or testimony asserting that Plaintiffs relied on Ms. Moreno's or other County representatives' advice or recommendations in obtaining any additional financing or proceeding with their development of The Property.

At trial much was made by the Plaintiffs that they did not

23

feel Ms. Moreno's predecessor as Community Development Director supported the project and had taken an adversarial position to their development of The Property.  While trying to place blame and question the conduct of others, the Plaintiffs do not provide sufficient evidence of any improper conduct of County representatives or reliance on representations by county representatives in proceeding with the golf course and development of The Property.  The court finds that any of the complained of hostility and difficulty asserted by Plaintiffs is not out of the ordinary for someone attempting to obtain a significant land-use change.  The Plaintiffs have not shown that they were deprived of the opportunity to properly and fairly present the requested land-use change to the Board of Supervisors.

The Plaintiffs also complain about the work done by Keith Dunbar, who was hired by the County to prepare an EIR the Plaintiffs' land-use application,[33] and the termination of Mr. Dunbar by the County.  Plaintiffs' complaints about the termination of Mr. Dunbar as the consultant for the County and that Mr. Dunbar had been paid some fees do not establish a basis for finding improper conduct by the County.  The County terminated Mr. Dunbar when it was concluded that he was not making sufficient progress in preparing the EIR, that the work product consisted of little more than generic boilerplate EIR text, and that the product was not sufficient to warrant further payment to Mr. Dunbar.  Additionally, in his testimony, Michael Nemee neglected to disclose

---

[33]  Though employed by the County, Mr. Dunbar's fees were paid from monies that the Plaintiffs were required to deposit with the County as a condition of processing the land use application.

that upon termination of Mr. Dunbar, the County returned to Plaintiffs the $30,000.00 balance of the Plaintiffs' deposit for Mr. Dunbar's fees held by the County.

Though on a professional level the communication concerning the termination of Mr. Dunbar could have been better managed between the County and the Plaintiffs, it does not support a finding that the County acted improperly.  The fact that a professional is paid a portion of the fees before the client ascertains that the product is inadequate is not unusual.  The contract between the County and Mr. Dunbar for the preparation of the EIR documents provided that payments would be made before the draft administrative EIR would be presented to the County.  There is nothing unusual about paying a professional as they are doing the work to develop a draft for a client.  As discussed in this decision, what the Plaintiffs describe as an adversarial relationship with the County may well have arisen from the friction which is created by their business strategy to develop a golf course not permitted by the Zoning Ordinances.  The "build it first and then seek approval after the fact" approach generated a number of complaints and otherwise unnecessary issues for the County and Plaintiffs to address with respect to The Property and the development the Plaintiffs desired.

**Real and Personal Property Taxes**

The Plaintiffs also contend that increases in the real and personal property taxes relating to the development and operation of a commercial 18-hole golf course on The Property is evidence that the County was responsible for the Plaintiffs proceeding with, or that the County approved, the construction of the golf course.

The assessed values of the real and personal property used by Calaveras County to increase or decrease property taxes were based upon the information provided to the county assessor by the Plaintiffs themselves.    As the Plaintiffs made substantial improvements to the real property through the golf course construction, they reported those improvements to the County Assessor.   The Assessor then valued The Property based upon such information.   The assessed value was then used by other officials to compute and collect the taxes.    Subsequently, in 2008 the Plaintiffs sought a reassessment of the real property value based upon the County asserting that the development of the golf course was illegal.   The real property taxes were reduced by the County.

Personal property used in the operation of the golf course was also taxed by Calaveras County based on personal-property business assets being reported to the Assessor by the Plaintiffs.   Whether or not the business assets are put into active service by the owner, they are taxed by the County.[34]   Again, the Plaintiffs advised the County of events which triggered the assessment, and the increase in value based on the reported information then resulted in the tax collector seeking payment of higher real and personal property taxes.

The reassessment of The Property and the tax statements generated by the County were not dependent upon a determination that the operation of a commercial golf course by the Plaintiffs was legal, but based upon information provided to the County by the

---

[34]   Cal. Rev. & Tax. Code § 30800 *et. seq.*

26

1  Plaintiffs.[35]  No law or facts have been shown that the assessor or
2  tax collector determine zoning compliance and legal uses of land
3  under the Calaveras County Zoning Ordinances.

4  **Sophistication of the Plaintiffs**

5      As an undercurrent to the arguments presented by Plaintiffs,
6  a theme is developed that Plaintiffs are simple folk and relied
7  upon the advice of County representatives to embark on this multi-
8  million dollar development of The Property.  By the Plaintiffs
9  accounting, they have expended $7,093,517.00 through 2009 in
10 developing The Property for the commercial 18-hole golf course.
11 The monies expended are broken down in the following annual
12 amounts:[36]

|      |             |
|------|-------------|
| 2004 | $  563,302  |
| 2005 | $1,753,027  |
| 2006 | $1,029,061  |
| 2007 | $2,128,760  |
| 2008 | $1,089,570  |
| 2009 | $  529,797  |

16 ///

17     The court does not find the testimony and arguments presented
18 by the Plaintiffs that they relied upon the advice and direction of
19 County representative to be either credible or plausible.   The
20 court finds that the Plaintiffs were and are sophisticated business
21 persons who hired professionals to represent them in the

---

[35]  Even to the extent that the Plaintiffs could show that
the Assessor thought that he or she was valuing The Property for
a golf course properly built on the property zoned for
agriculture, "payment of taxes on an illegal structure does not
prove that upon payment of taxes the structure becomes legal or
that the illegality of the structure renders the entity immune
from taxation." *Golden Gate Water Ski Club v. County of Contra
Costa*, 165 Cal. App. 4th 249, 258 (2008).

[36]  Pls.' Ex. 48.

development and marketing of their destination golf resort, Trinitas. The Plaintiffs chose and were actively represented by land-use and engineering professionals throughout the development of The Property and land use application process. The Plaintiffs did not rely upon advice and direction from the County in making their land use and business decisions, but relied upon the advice and counsel of their professionals and their own business judgment. This development of The Property and creation of a private membership golf club for the commercial 18-hole golf course was a complex real estate, land use, and business transaction. In addition to the land use and engineering professionals, the Plaintiffs engaged counsel to obtain approval from the State to sell securities for membership in the golf club for the commercial 18-hole golf course.

Further, the Plaintiffs and their professionals clearly knew that it was the Board of Supervisors who must approve, by a majority vote, the application for the land-use changes. When that failed, the Plaintiffs and their professionals knew that the Board of Supervisors must determine, by a majority vote, an appeal of the Planning Commission determination that golf course was not Agritourism under the Calaveras County Zoning Ordinances. The Plaintiffs did not rely on County representatives in development of The Property, their strategy for developing The Property under the existing Zoning Ordinances, or advocating the land use application before the Board of Supervisors. The strategy of how, what, and when to present matters to the Board of Supervisors was developed and adopted by the Plaintiffs with the advice and direction of the professionals they hired to achieve their economic goals for The

Property.

The court finds that construction of the golf course and development of The Property by the Plaintiffs was not done based upon being misled by representatives of the County or a misunderstanding of the law, but as part of a calculated business strategy of the Plaintiffs.  At the heart of this strategy  is a "it is better to seek forgiveness than to get permission" approach to land use and real estate development.[37]  This strategy for development and use of The Property was first demonstrated when Plaintiffs acquired The Property and set out to remodel a barn into a residence.  It was not until the County code officers contacted the Plaintiffs about work having been done on the barn without permits that the Plaintiffs undertook an after-the-fact documentation of the construction.  The action by which they sought forgiveness for having done the remodeling without permits was to provide the County with letters represented to be from licensed contractors verifying the work they had done on the barn.[38]  This act-first-and-then-deal-later-with-the-problems approach permeates

---

[37]  This phrase and aggressive approach to achieving results is attributed to Rear Admiral Grace Hopper, USN.

[38]  Even this simple process was not without controversy between the Plaintiffs and the County.  Two licensed contractors provided written confirmations of the work previously done on The Property.  One letter was provided for the electrical work (with Michael Nemee's father being the certifying licensed electrical contractor) and the other for plumbing work (with an unrelated contractor providing the plumbing certification) done in remodeling the barn.  When verifying the written confirmations delivered to the County by Michael Nemee, the County's investigation disclosed that the plumber denied having provided a written confirmation to Michael Neemee for presentation to the County.  The plumber did confirm for the County representative that he had done the plumbing work for Michael Nemee.

1  the Plaintiffs' conduct in the matters before the court.

## EXPERT WITNESS TESTIMONY CONCERNING
## CALAVERAS COUNTY AGRITOURISM ZONING ORDINANCE

The court is required to determine the meaning of the term "Agritourism" as it is used in the Calaveras County Zoning Ordinances as amended in 2005. To assist the court, both parties have presented expert and percipient witnesses concerning the adoption of the 2005 amendments to the Zoning Ordinances by the Calaveras County Board of Supervisors. The Property at issue in this case was and is zoned either Agriculture Preserve (AP) or General Agriculture (A-1). In addition to reviewing the Zoning Ordinances, the court has been presented with a determination by the Calaveras County Board of Supervisors that a commercial golf course is not Agritourism under the Calaveras County Zoning Ordinances.

Testimony by experts is governed by Fed. R. Evid. 702, which limits such testimony to "scientific, technical, or other specialized knowledge [which] will assist the trier of fact to understand the evidence or determine a fact in issue . . ." The expert testimony in this case has been considered by the court consistent with the strictures of Fed. R. Evid. 702.

///

David Zilberman, Ph.D., testified for the Plaintiffs concerning his interpretation of agriculture and agritourism, as those terms are used in the 21st Century. Dr. Zilberman's credentials were presented in the record and he approached this issue as an economist. He advocates the court adopt an expansive definition of the terms agriculture and agritourism as any use of

30

the land that produces something of economic utility.  Though a golf course does not produce something which is harvested for food, clothing, fuel, building materials, aesthetics, or other on- or off-property use, the ground is used to grow products (grass, trees, plants) and utilize resources (waterways, features of the land) for reusable use by consumers (the golfers).  It is his opinion that utility derived from the agricultural activity, not the mere destruction or consumption of an agricultural product, should be the basis of the court's interpretation of the Zoning Ordinances.  From the perspective of an economist, Dr. Zilberman concludes that a golf course represents one of the highest and best uses of agricultural property, and therefore a golf course is agriculture and Agritourism.

The materials presented by Dr. Zilberman as part of his testimony include an analysis which monetizes the value for the use of the agricultural land on a per acre foot of water consumed and per acre of land basis.  This data[39] includes the following information for the court:

///

| Agricultural Commodity | Revenues (Product Value) $1,000 | Revenues per Unit of Water $/acre foot | Revenues per Unit of Land $/acre |
|---|---|---|---|
| Grains | $113,621 | $79 | $204 |
| Rice | $231,001 | $72 | $422 |
| Cotton and Cottonseed | $1,025,523 | $367 | $1,122 |

---

[39]  Cited Source: Hawkins, Tom. 2009.  Agricultural Water Use Collection Program.  Department of Water Resources, State of California, Sacramento SC, June 9.

31

| | | | |
|---|---|---|---|
| Sugar Beets | $111,835 | $309 | $1,196 |
| Corn | $157,985 | $89 | $610 |
| Beans, Dry | $56,700 | $205 | $506 |
| Tomatoes, Processing | $617,190 | $742 | $2,277 |
| Tomatoes, Fresh Market | $333,840 | $2,840 | $7,800 |
| Cucubits | $382,549 | $1,535 | $4,096 |
| Garlic and Onions | $443,047 | $1,711 | $5,001 |
| Potatoes | $271,613 | $2,479 | $5,154 |
| Other Truck Crops | $8,607,152 | $5,724 | $9,429 |
| Almonds and Pistachios | $919,789 | $376 | $1,601 |
| Other Deciduous Nuts and Fruits | $1,308,940 | $571 | $2,294 |
| Subtropical Crops | $1,103,130 | $752 | $2,948 |
| Grapes, All | $2,836,313 | $1,661 | $3,430 |
| Alfalfa and other Sources of Hay | $730,422 | $127 | $477 |
| Safflower and Other Field Crops | $552,892 | $131 | $584 |
| | | | |
| All Crops | $19,903,533 | $645 | $2,264 |
| Golf Courses | $1,744,839 | $5,126 | $14,431 |

From an economist's perspective, this chart demonstrates that the use of agricultural property for a golf course is substantially more valuable in the revenues per acre golf produces than other traditional agricultural activities. On an average basis for all crops, golf produces 795% more value per acre foot of water and

32

637% more value per acre of land.  When compared to a subset of the five highest revenue crops, on average golf produces 727% more value per acre foot of water and 366% more value per acre of land.[40]

In his testimony Dr. Zilberman acknowledged that he did not review the Calaveras County Zoning Ordinances at issue, nor was he providing testimony as to any specific zoning code.  His testimony was as an economist concerning the most productive use of agricultural property.  Additionally, his testimony does not take into account the societal, political, and non-economic considerations underlying Zoning Ordinances in general and the specific ordinances at issue for Calaveras County in this case.

For the Defendant, Thomas Jacobson testified as an expert witness.  Mr. Jacobson's qualifications were presented in the record.  His testimony addressed the Calaveras County Zoning Ordinances at issue and he opined that the County was reasonable in determining that the Plaintiffs' golf course was not Agritourism as that term in used in the Calaveras Zoning Ordinances.  His testimony focused on the interpretation of the examples provided in the Ordinance, which he found to indicate an intention of the Board of Supervisors to limit Agritourism to uses which did not require any significant change to the land from its traditional agricultural uses.  In coming to his conclusions, Mr. Jacobson considered the hearings conducted by the Board of Supervisors in

---

[40]  The five largest revenue crops in the study are Other Truck Crops, Almonds and Pistachios, Other Deciduous Nuts and Fruits, Subtropical Crops, and Grapes.  This represents 74% of the total crop revenue and excludes some of the outlying low-per-dollar-per-acre crops.

adopting the 2005 amendments to the Zoning Ordinances, the 2009 hearing denying the Plaintiffs' appeal of the Calaveras County Planning Department, and the Planning Commission rulings that the golf course was not Agritourism.

The third witness, Kenneth Churches, the former UC Davis Cooperative Extension Branch in Agriculture Farm Advisor for Calaveras County, was presented as an expert and percipient witness to the 2005 amendments to the Zoning Ordinances. Mr. Churches participated with a group called the Ag-Coalition, which was the sponsor and drafter of proposed zoning ordinance amendments which were presented to the County and ultimately led to the 2005 amendments. The members of the Ag-Coalition met with members of the Planning Department, including Robert Sellman, Supervisors, and other members of the public.

Mr. Churches expressed his opinion that Agritourism is a type of rural tourism which is intended to enhance and promote the economic viability of more traditional agricultural endeavors. The Ag-Coalition was formed to update the Zoning Ordinances to allow activities on property zoned for agriculture which are consistent with agricultural uses and improve the economics of such agricultural properties. The Ag-Coalition drafted the language which was ultimately enacted by the Board of Supervisors without any substantial change. Mr. Churches testimony is that the Ag-Coalition intentionally drafted the proposed definition of Agritourism in open-ended, nonspecific terms, and did not provide enumerated permitted uses, as is done in the other provisions of the Zoning Ordinances, to allow for future changes in Agritourism uses without having to amend the Zoning Ordinances. Such non-

34

identified uses would be dependant upon subsequent interpretations
of the Zoning Ordinances, though Mr. Churches did not state whom he
though would be responsible for such determinations.

The draft language prepared by the Ag-Coalition included a
series of nonexclusive examples of Agritourism.    These examples
were included in the Zoning Ordinance ultimately enacted by the
Board of Supervisors.  Notwithstanding these examples, Mr. Churches
asserts that so long as there is some form of agricultural activity
on a property, the owner could engage in any other activity as a
form of Agritourism to help make agricultural property more
economically viable.   Additionally, Mr. Churches testified that
Michael Nemee was involved with the Ag-Coalition when the 2005
zoning amendments were being advanced, he did not recall Michael
Nemee ever asserting that golf was Agritourism.  With respect to
golf courses, Mr. Churches testified that while it was discussed,
it was not included on the descriptive list to be stated in the
ordinance, nor was it expressly excluded from the definition of
Agritourism.

Finally, Robert Sellman, the Calaveras County Planning
Director when the 2005 amendments were adopted, testified as to his
participation in the process on behalf of the County.  Mr. Sellman
testified that he affirmatively told the Ag-Coalition that golf was
not considered to be Agritourism, though there is not a reference
to this exclusion in the written record.   Further, he directs the
court to the negative declaration and environmental documents
relating to the Board of Supervisors amending the Zoning Ordinances
in 2005 which make no reference to a golf course.  This negative
declaration states that the changes to the Zoning Ordinances in

2005 would not cause a significant effect on the environment. Given the nature of the other examples, allowing a use which so dramatically changes and develops agricultural property into a golf course, Mr. Sellman testified that a negative declaration of the environmental impacts would not be sufficient. Mr. Sellman was clear in his testimony that while the Ag-Coalition drafted proposed amendments to the Zoning Ordinances, these were delivered to the Calaveras County Planning Department which prepared the actual amendments and supporting documents which were considered by the Board of Supervisors.

The testimony and evidence presented leads to the court making a number of findings. First, the Ag-Coalition, as the sponsor of the 2005 amendments, intentionally drafted and proposed a definition of Agritourism in a manner to leave open and uncertain what actual economic activities the Board of Supervisors intended to constitute Agritourism. This stands in contrast to other provisions in the Calaveras County Zoning Ordinances which permits specific activities. In doing so the Ag-Coalition was insuring that future disputes would arise as to what is permitted and that some governmental body would have to make the ultimate determination. No governmental body at the County, other than the Board of Supervisors, is identified to make the determination as to what is included in the term Agritourism. While creating an opportunity to have theretofore uncontemplated uses subsequently determined to be Agritourism, the proponents of this nonspecific definition also insured that there was a risk that some activities would not be within their unstated intentions of what should be Agritourism. Secondly, the Calaveras County Board of Supervisors

36

enacted the 2005 amendments after having the language prepared by the Planning Department and receiving extensive documentation from County staff.   While the personal opinion of Mr. Churches as to what he intended, but did not specify in the draft language, when submitting it to the Planning Department gives the court an insight to the agricultural business interests which were being advanced, it does not provide substantial assistance to determining the intent of the Board of Supervisors.

Third, the Plaintiffs embrace Dr. Zilberman's opinion that agricultural land should be put to the most profitable use without regard to traditional definitions and concepts of agriculture. Dr. Zilberman was clear in this testimony that he envisioned an economic-use policy which allowed the land owner to use it for the most profitable purpose possible.   This did not attempt to take into account theoretical or actual Calaveras County land-use policies, zoning issues and general-welfare policies.

## INTERPRETATION OF THE CALAVERAS COUNTY ORDINANCES FOR PROPERTIES ZONED AGRICULTURE PRESERVE AND GENERAL AGRICULTURE

The County has argued that because the Board of Supervisors determined that a commercial golf course is not Agritourism, the only role for the court is to defer to that decision, so long as the process by which it was made was procedurally proper.   This contention is incorrect.   The California Supreme Court has established the court's role in considering land-use zoning ordinances and their proper application.   The rules of statutory construction are applicable to zoning ordinances in the same manner as they are to statutes. *Professional Engineers in California Government v. Kempton*, 40 Cal. 4th 1016, 1037 (2007); *Stolman v.*

37

*City of Los Angeles*, 114 Cal. App. 4th 916, 923-924 (2003).    To determine the intent of the statute or ordinance, the court looks first to the plain language and ordinary meaning of the words used. The words are read in context of the ordinance, considering the nature and purpose of the enactment.    If the language is clear, then no further interpretation of the statute is necessary.    If the language is ambiguous, then the court considers extrinsic evidence, *Kempton*, 40 Cal. 4th at 1037, which includes the legislative history, public policy, and the statutory scheme of which the statute is a part.    Finally, if after reviewing the plain language and extrinsic aids the meaning of the statute remains unclear, the court, proceeding cautiously, applies reason, practicality, and common sense to the statute.    *Woodland Park v. City of East Palo Alto Rent Stabilization Board*, 181 Cal. App. 4th 915, 920 (2010).

Ordinarily, questions of law such as interpretation of an ordinance are subject to *de novo* review by the court.    *Stolman,* 114 Cal. App. 4th at 927-928.    The court may consider the zoning administrator's interpretation, but is not bound by it.    *Id.* Another District Court of Appeal panel expanded this concept, finding that the court should accord great weight to the contemporaneous administrative interpretation given to a statute unless that interpretation is palpably erroneous.    "Where the administrative agency interpreting the statute 'has special expertise and its decision is carefully considered by senior agency officials, that decision is entitled to correspondingly greater weight.'"    *McKell v. Washington Mutual, Inc.*, 142 Cal. App. 4th 1457, 1479 (2006), (internal citation omitted).    While the court has the ultimate responsibility for the construction of a statute,

great weight and respect is given to administrative construction of the statute. *Yamaha Corp. of America v. State Board of Equalization*, 19 Cal. 4th 1, 12 (1998); *Sharon S v. Superior Court*, 31 Cal. 4th 417, 436 (2003).[41]   When assessing a nonjudicial interpretation of a statute or ordinance, the court must consider a complex set of factors material to the legal issue before it. The court begins with the assumption that the agency has expertise and technical knowledge concerning the matter, especially if it is technical, obscured, complex, open ended, or entwined with issues of fact, policy, and discretion. Additionally, the court will give deference to an interpretation by senior officials made after public notice, that evidences a consistently made interpretation, which is made contemporaneous with the enactment of the statute. *Yamaha Corp.*, 19 Cal. 4th at 13.

The County provided the transcript from the public hearing on the Plaintiffs' appeal of  the Planning Department determination that the commercial 18-hole golf course on The Property was not Agritourism as that term is used in the Calaveras Zoning Ordinances.   The County argues that the court should give great deference to this decision, based upon the specialized knowledge of the Planning Department, the public consideration of the issue, and a consideration of the broad land use policies.   However, this court also considers that this decision was not made

---

[41]   *See also Evans v. Unemployment Insurance Appeals Board*, 39 Cal. 3d 398, 407 (1985), and *Employment Development Department v. California Unemployment Insurance Appeals Board*, 190 Cal. App. 4th 178, 179 (2010) (nonjudicial interpretations must be rejected when they are contrary to statutory intent or incorrect).

contemporaneous with the enactment of the Zoning Ordinances, and in fact was made in light of pending litigation on the issue commenced by the Plaintiffs against the County. As opposed to the more normal situation where a landowner approaches the Board of Supervisors with a proposed prospective future use of real property, the Plaintiffs were already millions of dollars into the development of the golf course (though not the lodge and other amenities they envision for The Property) and were engaged in litigation to enforce alleged rights against the County. To give great deference to the County in this situation would effectively be turning over the resolution of a then ongoing judicial proceeding to one of the adversary parties.

Notwithstanding the pending issues which preclude giving great deference to and adopting the interpretation of the County on the meaning of the zoning ordinance, the court determines that the interpretation by the Board of Supervisors is correct-the commercial golf course is not Agritourism as defined under the Calaveras County Zoning Ordinances. The court reaches this conclusion based on its own interpretation of the ordinance as set forth in this decision.

///

///

///

**Meaning of Agritourism under Calaveras County Zoning Ordinances**

The Calaveras County Zoning Ordinances are set upon a foundation that no building or structure shall be constructed, nor any land use commenced, enlarged, or altered unless it is permitted in, and meets the requirements of, the zone in which the land is located.[42]    This is a permitted-use structure of zoning ordinances in which the County specifies the allowed uses of real property. This is contrasted to a statutory scheme in which any and all activities are permitted unless expressly prohibited.

The Plaintiffs argue, though not pled in the Second Amended Complaint, that a golf course is an Agricultural Operation as defined by the Calaveras County Zoning Ordinances,[43] and therefore the court does not need to consider whether it is Agritourism.  The court rejects this argument for several reasons.    First, the Ordinance is clear that Agricultural Operation relates to the growing, harvesting, and sale of plants, food, and fiber crops, and livestock.  Calaveras County, Cal., Code § 17.06.0132.  The other activities described relate to or are consistent with serving such growing, harvesting, and sale activities.  The preparation of the land, including land leveling and clearing, is for this agricultural purpose, and not as the Plaintiffs have argued, any and all land-leveling or clearing for whatever purpose.  Range management practices relate to improving real property in its natural condition, not completely remaking it at multi-millions of dollars of expense.  Second, merely because something may have to

---

[42]    Calaveras County, Cal., Code § 17.04.010.

[43]    Calaveras County, Cal., Code § 17.06.0132

41

do with plants or animals does not mean that it is permitted in either Agricultural Preserve or General Agriculture zoned properties. Focusing on whether something involves plants or animals is merely the beginning of the analysis of whether it is permitted under the Zoning Ordinances.

Third, the Board of Supervisors has specifically identified livestock and ranching activities on property zoned for agriculture. These activities are consistent with the common definition of agriculture which goes with using the land for the harvesting and sale of plants, food, and fiber crops, or the raising, production, and sale of livestock. The court does not find persuasive Plaintiffs' contention that since they grow olives on The Property, then whatever other use they make of The Property, such as building a multi-million-dollar golf course is an agricultural activity.

Fourth, permitted "customary uses clearly incidental and secondary to the agricultural operation" on property zoned for agriculture do not include golf.[44] No showing has been made that the multi-million-dollar golf course developed on The Property is an activity which is a (1) customary use of agricultural property, and (2) which is incidental and secondary to the olive orchard on The Property. To the contrary, the expert witnesses presented by the Plaintiffs provided clear testimony that golf is not a customary agricultural use of property. Rather, they argued that golf should be a future best economic use of agricultural property. Additionally, as Dr. Zilberman testified for the Plaintiffs, golf

---

[44] Calaveras County, Cal. Code § 17.06.0132 ¶G

42

course use of property produces dramatically higher economic returns than the traditional harvesting and sale of plants, food, and fiber crops.   Golf is not incidental and secondary to such use of The Property, but becomes the primary and dominant use of The Property.

Finally, the court does not find the Plaintiff's contention that the provision in § 17.06.0132, ¶G stating that "the foregoing definition of Agricultural Operation shall be broadly construed unless limited by the strict provisions of the specific uses listed as permitted uses" means that golf, or any other activity is an "Agricultural Operation" so long as it involves the land and a plant.   The "broadly construed" direction is within the scope of the definitions within this section and the Zoning Ordinances. These sections are clear that they relate to the land being used for the harvesting and sale of plants, food, and fiber crops, or the raising, production, and sale of livestock.   The Plaintiffs' argument that so long as they grow something on the land, then it is an agricultural activity and then they can do whatever such activity they want is incorrect.

As a separate and independent ground in denying this contention, the Plaintiffs did not raise this claim that golf is a free standing Agricultural Operation on The Property until the trial.   This Adversary Proceeding had been pending in this court for twenty-two months, and even longer in state court before it was removed to this court.   In addition to failing on the merits, the Plaintiffs cannot engage in a trial-by-ambush strategy.   Even if the court were not to determine that a golf course was not an Agricultural Operation, it would not be a basis for the Plaintiffs

1 to prevail in this litigation by raising this new contention at the

2 start of the trial.[45]

**Permitted Agriculture Zone Uses**

In establishing the Agriculture Preserve and General Agriculture Zoning Ordinances, the Board of Supervisors states the general purposes underlying each of these Ordinances. Property zoned General Agriculture (A1) is to be the main resource production zone in the County.[46] The Zoning Ordinance classifies these areas for general farming and ranching practices, with such as the primary emphasis for these properties. Residential uses are placed in a position of secondary importance when compared to the commercial scale production of food and fiber. Property zoned Agricultural Preserve (AP) is to protect and preserve lands for intensive agriculture and ranching production.[47] The Agriculture Preserve property may also be utilized for open-space protection and preservation, with the County stating that the enumerated uses in the Zoning Ordinances are consisted with the Williamson Act.

The Calaveras Zoning Ordinances are express in both nature and scope of the activities permitted on property zoned for agriculture.[48] The activities described are traditional agricultural activities by which the owner uses the land for the harvesting and sale of plants, food, and fiber crops, or the

---

[45] The County timely objected to the Plaintiffs attempting to raise other claims at the time of trial.

[46] Calaveras County, Cal., Code § 17.16.010.

[47] Calaveras County. Cal., Code § 17.18.010

[48] *Id.* § 17.18.020 (AP permitted uses), § 17.18.021 (AP conditional uses), § 17.16.020 (A1 permitted uses), and § 17.16.021 (A1 conditional uses).

raising, production, and sale of livestock.  Express provisions are made for permitted nontraditional agricultural activities such as a residential care facility (six or fewer clients), private equestrian facility (1 to 15 clients), contractor base/yard, rural veterinary clinic, veterinary clinic, child day care (12 or fewer children), medical services/rural home doctor offices, heliport, and power generation (on-site residential or agricultural use).

In specifying the conditional uses, the Board of Supervisors has identified uses which have a much greater change to real property from the harvesting and sale of plants, food, and fiber crops, or the raising, production, and sale of livestock for which a use permit must be obtained from the County.  Examples included in these additional, conditional use, activities are (1) larger dairies, hog farms, livestock feed lots, and poultry and rabbit facilities, (2) retail agricultural equipment sales and rental, farm supply and feed store, farmer's market, and flea market, (3) equestrian facility (over 15 clients), special events (less than 1,000 people), (4) private cemetery, (5) recreational vehicle storage, (6) personal landing field, (7) telecommunications facility, (8) public utility facility, (9) slaughter/butchering (10) fabrication/storage/transport, (11) surface and subsurface mining, (12) developed campground, (13) nonmunicipal air strips and glider ports, and (14) waste disposal, food/septic.  It is significant that the Board of Supervisors expressly describe the uses which are permitted without further consideration by the County, those which require further review, and those for which the issuance of an or conditional use permit are required.  Not every activity is permitted merely because it is "agricultural."

**A Commercial Golf Course is Not Agritourism Under
the Calaveras County Zoning Ordinances**

The Plaintiffs contend that since the commercial 18-hole golf course winds through the olive orchard, that significant revenues would be generated from golf to support the olive orchard and activities related to the olive crop, and that they will sell olive orchard products to golfers, the commercial 18-hole golf course and all of its development is permitted Agritourism as a matter of right. The Plaintiffs focus the court on the argument that it was the intention of the Ag-Coalition in drafting its definition of Agritourism to allow farmers to engage in any activities which will generate income to help underwrite the costs of the traditional agricultural activities. To accept this interpretation of the Ordinance would result in almost any and every money-making activity to be conducted by a landowner on the property, and allow activities not intended by the Board of Supervisors on agricultural property. This would render the carefully crafted permitted activities and administrative/conditional use activities a hollow shell, with Agritourism trumping this detailed set of ordinances in the County statutory scheme.

Consideration of the definition of Agritourism and the permitted uses thereunder begins with the plain language enacted by the Board of Supervisors. The definition of Agritourism is,

> **17.06.0151 - Agritourism.**
>
> "Agritourism" means an enterprise located at a working farm, ranch, or other agricultural operation or agricultural plant/facility conducted for the enjoyment and education of visitors, guests or clients that generates income for the owner/operator. Agricultural tourism refers to the act of visiting a working farm/ranch or to any agricultural, horticultural or agricultural operation for the purpose of enjoyment,

46

education or active involvement in the activities of the farm/ranch or agricultural operation that also adds to the economic viability of the agricultural operation.

Examples of agritourism enterprises include, but are not limited to, the following:

A.   Outdoor recreation:

    1. Camping/picnicking;
    2. Cross country skiing;
    3. Game preserve;
    4. Gold panning;
    5. Guide/outfitter operation;
    6. Horseback riding/hiking/nonmotorized biking;
    7. Wagon/sleigh rides;
    8. Wildlife viewing and photography.

B. Direct agricultural sales:

    1. Agricultural-related crafts/gifts.

C. Entertainment:

    1. Special events;
    2. Festivals;
    3. Hunting/working dog trials/training;
    4. Petting zoo.

D.   Educational experiences:

    1. Agricultural technical tours;
    2. Crop sign identification program;
    3. Exotic animal farm;
    4. Garden/nursery tours;
    5. Historical agricultural exhibits;
    6. Historical reenactments;
    7. Natural history tours;
    8. Ranch/farm tours;
    9. School tours;
   10. Winery/vineyard tours.

E.   Accommodations:

    1.   Farm/ranch vacations;
    2.   Guest ranch;
    3.   Youth exchange.

Calaveras County, Cal., Code § 17.06.0151.[49]

---

[49]   *See also id.* §§ 17.18.020, ¶ 21.a. and  17.16.020, ¶ 21.a. providing that Agritourism is a permitted use on property zoned Agriculture Preserved and General Agriculture, respectively.

This general description of Agritourism activities requires that the activities must be, "an enterprise located at a working farm, ranch, or other agricultural operation or agricultural plant/facility conducted for the enjoyment and education of visitors, guests, or clients." The Board of Supervisors has included a second definition within this section, stating that "Agricultural tourism refers to the act of visiting a working farm/ranch or to any agricultural, horticultural or agricultural operation for the purpose of enjoyment, education or active involvement in the activities of the farm/ranch or agricultural operation that also adds to the economic viability of the agricultural operation." This second defined term is not used anywhere else in the Calaveras County Code, and is the corresponding definition of what the visitors, guests, or clients are doing when attending the enterprise of the property owner on the working farm, ranch, or other agricultural operation as Agritourism.

At this point in their argument, the Plaintiffs contend that golfers observing the olive trees from the golf carts or as they are setting up a shot to the green are enjoying the activities of the Agricultural Operation. Further, that when they purchase the olive products, they are either being educated or involved in the farming activities. Plaintiffs argue that the court should determine the plain language of the Zoning Ordinances to allow the commercial 18-hole golf course as Agritourism, or divine this as the unstated intention of the Board of Supervisors. The only limitation on Agritourism in the Plaintiffs' interpretation is that there must be less than 75 persons involved in the activity at any

48

one time.[50]  However, the plain language of these Ordinances does not end with the general definition of Agritourism.  The Board of Supervisors provides specific examples of the type, nature, and quality of Agritourism under the Calaveras County Ordinances.

**Canons to Assist in Statutory Construction**

To assist and provide for consistency in statutory interpretation, the courts have developed additional rules to be applied in determining what is meant by a statute which is either unclear or is based on a general definition.  One common textual canon, *in pari materia* (literally, "part of the same material") directs that statutory language should not be looked at in isolation, but in the entire textual context.  The meaning of the enactment may not be determined from a single word or sentence, but the language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible.  *Dyna-Med, Inc. v. Fair Employment & Housing Com.*, 43 Cal. 3d 1379, 1387 (1987).  The context of the statutory language takes into consideration the statutory purpose, other statutes, and statutory sections relating to the same subject so that they are harmonized, both internally and with each other, to the extent possible. *Cal. Mfrs. Assn. v. Public Utilities Com.*, 24 Cal. 3d 836, 844 ( 1979).

A second canon of statutory construction of assistance in determining the correct meaning of these Zoning Ordinances is *noscitur a sociis* ( "it is known from its associates").  *Cal. Farm Bureau Fed. v. Cal. Wildlife Conservation Bd.*, 143 Cal. App. 4th

---

[50]    *Id.*

173 (2006). This canon provides that the meaning of words which are placed together in a statute should be determined in light of the words with which they are associated. *Id*. This is closely related to *Ejusdem Generis* ("of the same kind"), a canon which directs that where general words follow specific words, or specific words follow general words in a statutory enumeration, the general words are construed to embrace only things similar in nature to those enumerated by the specific words. *Id*. at 181 (looking to examples enumerated in the statute to understand the scope of the ambiguous portion of the statute and narrowing that scope according to the examples provided).[51]

While general in its description of Agritourism, the Board of Supervisors provides specific examples of the scope and nature of Agritourism which qualify under the ordinance. There are five general categories of activities: (1) Outdoor recreation, (2) Direct agricultural sales, (3) Entertainment, (4) Education, and (5) Guest ranch. A commonality to each of these categories, and the enumerated activities thereunder, is that none of them provide for significant site improvements or alternation of the agricultural land for the Agritourism activity. Described Agritourism activities include camping, picnicking, game preserve, gold panning, horseback riding, sleigh rides, wildlife viewing, tours, and historical reenactments, which utilize the agricultural property in its existing form. The Board of Supervisors has used a consistent set of examples demonstrating a rural, natural state

---

[51] Not surprisingly, parallel Rules and Canons exist in federal court and provide for a similar analysis of a statute or administrative rule if it had been enacted by Congress or other federal authority.

use of property for Agritourism. The multi-million dollar development of agricultural land into a commercial 18-hole golf course is not consistent with the enumerated examples provided by the Board of Supervisors.

Several examples specified by the Board of Supervisors in the definition of Agritourism highlight the natural use, no substantial development activities. Agritourism includes the outdoor recreation activity of cross-country skiing. However, downhill or alpine skiing is not listed as an example. As is commonly known, downhill skiing requires the substantial and complex development of the land, creation of ski runs through the removal of trees and boulders, reshaping of the hill, construction of ski lifts and generators for power, and construction of other support structures. Cross country skiing is an activity designed to utilize the land in the form it exists, with minimal alteration. Another two examples are horseback riding and hiking, where one traverses the existing countryside on horse or foot rather than on a manicured course dramatically altered from its natural state.

Though the Plaintiffs argued that under the Zoning Ordinances a permitted use for property zoned for agriculture could include an equestrian center, no provision is made for creating an equestrian center, stables, or arena as Agritourism. Rather, the use of an equestrian center is expressly provided as a permitted use in another part of the Ordinances (which requires a conditional use permit for more than 15 clients), and subject to significant limitations before such a development is made by the landowner.[52]

---

[52]  Calaveras County, Cal., Code §§ 17.16.030, 17.18.030.

51

This commercial 18-hole golf course is clearly no cross-country ski, hiking, nature walking trail. By the Plaintiffs' own accounting, the development of the commercial golf course on The Property has cost in excess of $7,093,517.00 since 2004. There has been significant grading and altering of the natural terrain and flora. Not only is The Property not being used in its agricultural form, the existence of the golf course precludes its use for growing, harvesting, and sale of any agricultural commodity.

The plain language used by the Board of Supervisors in defining Agritourism and permitting other activities does not include a golf course on property zoned Agriculture Preserved or General Agriculture in Calaveras County as Agritourism or other permitted use. It is clear that the Board of Supervisors has expressly permitted, and conditioned in some cases, uses on agricultural property which requires any significant development or change to such property. When it has intended to permit golf as a use for land, the Board of Supervisors has expressly included it in the Zoning Ordinances. Golf is allowed for single-family, two-family, and multifamily residential (in conjunction with a master planned community), two-family residential (in conjunction with a master planned community), rural commercial, rural home industry, local commercial, general commercial, professional offices, light industrial, business park, and recreation zoned properties.[53] Golf is expressly provided for in 11 of the 21 Calaveras County-base property zoning districts. The court will not presume that the

---

[53] *See id.* at §§ 17.24.020, 17.26.020, 17,28.020, 17.30.030, 17.32.020, 17,34.020, 17.36.020, 17.38.020, 17.40.020, 17,44.020, and 14.46.020.

Board of Supervisors had a secret, unstated intention to have golf included as Agritourism on property zoned for agriculture.

In attempting to counter the language of the Zoning Ordinances, express provision for golf in other zoning districts, the rules and canons of statutory construction, and the language used in defining Agritourism, the Plaintiffs direct the court to consider more physically intrusive permitted activities allowed in the Zoning Ordinances on property zoned for agriculture. However, in doing so the Plaintiffs do not direct the court to Agritourism activities, but to other expressly permitted uses on properties zoned for agriculture which are not Agritourism.   The Plaintiffs request this court to ignore what the Board of Supervisors expressly permits in the Zoning Ordinances, and instead have the court rewrite the statute to state what the Plaintiffs desire.  The court will not insert itself into making the economic, societal, political, and practical  decisions for the Calaveras County Board of Supervisors, or presume that this court has greater wisdom to write a permitted use which does not exist into the Zoning Ordinance.

Golf is not a permitted activity under the Calaveras County Zoning Ordinances either prior to or after the 2005 amendments which created a permitted use for Agritourism, as defined by the Calaveras County Ordinances, for property zoned Agricultural Preserve or General Agriculture.

**THE PLAINTIFFS FAIL TO ESTABLISH THAT CALAVERAS COUNTY SHOULD BE ESTOPPED FROM ENFORCING ITS ZONING ORDINANCES**

Notwithstanding the court determining that the golf course on the Plaintiffs' property is not a permitted purpose under the

53

Calaveras County Zoning Ordinances, the Plaintiffs assert that the County is estopped from enforcing that Zoning Ordinance with respect to the Plaintiffs' commercial 18-hole golf course.  It is argued that due to County employees making representations to representatives at Community Bank of San Joaquin and the Plaintiffs, including at the November 9, 2006 meeting, the Plaintiffs and Bank would not have proceeded with the development of the golf course.  As set forth in this decision, the court finds that no such representations or reliance exists, and concludes that no grounds exist to estopp the County from enforcing its Zoning Ordinances.

The fact that the defendant is the County or the conduct to be enjoined is the enforcement of a zoning ordinance does not preclude the application of equitable estoppel.  The California Supreme Court addressed this issue in *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 493 (1970), holding,

> It is settled that "doctrine of equitable estoppel may be applied against the government where justice and right require it. (*United States Fid. & Guar. Co. v. State Board of Equalization* (1956) 47 Cal.2d 384, 388-389 [303 P.2d 1034] and cases there collected.)" (*Driscoll v. City of Los Angeles, supra,* 67 Cal.2d 297, 306.) (*See* generally 28 Am.Jur.2d, Estoppel and Waiver, §§ 122- 133, pp. 782-802; 31 C.J.S., Estoppel, §§ 138-147, pp. 675-733.) Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public, . . ." (*County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829-830 [186 P.2d 124, 175 A.L.R. 747], see also cases there cited.) The tension between these twin principles makes up the doctrinal context in which concrete cases are decided.

All four elements must be present for the doctrine of equitable estoppel to apply: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon,

or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury. *Id.* at 489.[54]

The California District Court of Appeal recently addressed the issue of equitable estoppel being applied against a governmental entity in *Golden Gate Water Ski Club v. County of Contra Costa*, 165 Cal. App. 4th 249 (2008). The District Court of Appeal noted that a party faces "daunting odds" in establishing estoppel against a governmental entity in a land-use case. The court balances,

> the injustice done to the private party with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. . . . Accordingly, estoppel can be invoked in the land use context in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.

*Id.* at 259 (internal citation to *Toigo v. Town of Ross*, 70 Cal. App. 4th 309 (1998) omitted). The District Court of Appeal stated this conclusion, citing to *Mansell*, for the proposition that while the doctrine of equitable estoppel is not barred in land-use cases, it will not be applied if to do so would effectively nullify a strong rule of policy adopted for the benefit of the public. *Id.*

In considering the claim of equitable estoppel, the court does not have to address the more complex balancing of injustice to the Plaintiffs and impact on the public policy because the Plaintiffs have not established the basic elements for estoppel. The

---

[54] However, citing back to its earlier decision, the court in *Mansell* quoted *Sacramento v. Clunie*, 120 Cal. 29, 30 (1898), holding that equitable estoppel will be applied against a public agency only in those special cases where the interests of justice clearly require it. *Mansell*, 3 Cal. 3d 462, 493 & n.30 at 396 (Cal. 1970).

55

Plaintiffs have not show that there were statements made by the County or its representatives concerning facts relating to the approval of the land use application upon which the Plaintiffs were intended to rely. The testimony is clear that to the extent that Ms. Moreno made any representations to the Plaintiffs and representatives of Community Bank of San Joaquin, such statements were merely an explanation of the land use application process, what the County staff was doing to move the process forward, that Ms. Moreno did not foresee opposition, and that the ultimate decision was that of the County Board of Supervisors.

The testimony from Mr. Nemee and the various Bank representatives was that they all understood that it was the Board of Supervisors who must approve any land use application, not Ms. Moreno or any of the County staff. In feigned outrage, Michael Nemee now testifies that it was Ms. Moreno attending the meeting which resulted in the Bank extending the due date on the Plaintiffs' loan and extending an additional $300,000.00 in credit so that the Plaintiffs could continue with the land use application. Michael Nemee's outrage and attempted placing of blame on the County ignores the fact that it was he who requested that Ms. Moreno attend the meeting, and it was the Plaintiffs who were seeking an extension of the due date on the Plaintiffs' loan and additional credit.

To the extent that Michael Nemee had conversations with other County staff, such as the Agriculture Commissioner or Planning Director, none made any representations or provided any assurances that the development of a commercial golf course was permitted on

the Plaintiffs' property.[55] As Jerry Howard, the then Calaveras County Agricultural Commissioner, testified, Michael Nemee represented that the golf holes being constructed were for private, personal use of the Plaintiffs, and that Mr. Howard did not consider such personal use to be contrary to the Williamson Act. Jerry Howard also testified that he did not consider, and did not make any representations to the Plaintiffs concerning, land use zoning issues because that was beyond the scope of his office.   It is clear that at most, the Plaintiffs were aware that there was at best a disagreement between members of the County staff whether a private, personal use golf course could be constructed on property zoned for agriculture.[56]

The December 14, 2006 Credit Authorization Memorandum from the Community Bank of San Joaquin clearly states that the Bank knew that golf course was illegal under the existing ordinances when constructed. Consistent with the Credit Authorization Memorandum, Robert Daneke, the Bank Credit Officer at the time of the 2006 meeting testified that the Bank made the loan based on the raw land

---

[55] "No government, whether state or local, is bound to any extent by an officer's acts in excess of his authority." *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.*, 4 Cal. App. 4th 1538, 1563-1564 (1992).

"One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his peril to ascertain the extent of his powers to bind the government for which he is an officer, and act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted." *Id.*

[56] Any alleged agreement to permit development without application of land-use regulations would be invalid and unenforceable as contrary to public policy. *Burchett v. City of Newport Beach*, 33 Cal. App. 4th 1472, 1480 (1995).

value and not based on any of the golf course improvements being made by the Plaintiffs.

It is also clear that the Plaintiffs proceeded with the development of The Property knowing that it did not meet the then existing zoning for The Property.   There was no reliance on any representations of anyone at the County that the construction of an 18-hole commercial golf course was legal.[57]   From the evidence presented to the court, the Plaintiffs' intentionally proceeded with building the golf course banking on obtaining an after-the-fact land use change by the Board of Supervisors.   Given the representation of the Plaintiffs by various professionals and sophistication of the business endeavor, including the issuance of securities for membership in the golf club, this is not a naive, innocent use of The Property by the Plaintiffs.

In California, the Brown Act governs the conduct of county and local governmental entities.[58]   This law requires that government decisions be made at public open hearings, with specified exceptions not applicable to the Plaintiffs' land use application at issue.   This serves the obvious purpose of allowing the public to know the decisions being made by their public officials, who make the decisions, and an opportunity to address those public

---

[57]   When a company purchases property "relying on the initial finding of consistency by the Board, before a final decision by the zoning administrator on the use permit application, it takes a business risk." *Penn-Co v. Board of Supervisors*, 158 Cal. App. 3d 1072, 1081 (1984).   That landowner cannot reasonably have assumed that this finding was "absolute assurance that its application would not falter at another step along the way." *Id.*

[58]   Cal. Gov. Code §§ 54950 *et. seq.*

officials before making the decision.    Additionally, it insures
that members of the public, such as the Plaintiffs, are not taken
into the "backroom" and improper demands made of them, or that
special treatment is secretly provided which is not obvious to the
public. *Epstein v. Hollywood Ent. Dist. II Bus. Improvement Dist.*,
87 Cal. App. 4th 862, 868 (2001).    Here, the decision was
ultimately made at a public hearing by the Board of Supervisors
which everyone knew was the decision making authority.

The Plaintiffs may not like the decision of the Board of
Supervisors on their land-use application, but they are not
entitled to a different decision because they gambled and developed
the land for a commercial 18-hole golf course in the belief that
they could convince a majority of the Board of Supervisors to make
it legal after the fact.[59]

The Plaintiffs have also attempted to weave into the argument
that because the County may allow uses of other property by the
owner of Ironstone Vineyards which the Plaintiffs contend are
inconsistent with the Court's interpretation of Agritourism, the
County cannot enforce the Ordinances against the Plaintiffs.    This
contention misses the mark for several reasons.    Though referenced
by the Plaintiffs, the use of property by Ironstone is not now
before the court.    Further, as argued by the County, there are
other permitted uses under the Zoning Ordinances which may apply to
the Ironstone uses.    The court has not, and cannot, determine the
uses of property by Ironstone in the case now before the court.

---

[59]    The construction of additional structures nor the cost
associated with those structures, support the application of
equitable estoppel. *Golden Gate Water Ski Club*, 165 Cal. App. 4th
at 259.

1    Purported ignorance of the law is not an excuse for either a

2  civil or criminal violation of the law. *Jerman v. Carlisle,*

3  *McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. ___, 130 S. Ct. 1605,

4  1612 (2010).  To the extent that the Plaintiffs contend that based

5  on Ironstone's conduct the Plaintiffs believed that their

6  development was permitted, it is not a valid argument.  First, the

7  Plaintiffs are responsible for their conduct, not the conduct of

8  Ironstone.  To the extent that Ironstone is violating the law, the

9  County and State have the responsibility to enforce the laws, or

10 for other residences of Calaveras County to assert their rights if

11 the County is engaging in differential enforcement of the law.  The

12 Plaintiffs cannot argue that since someone else is allowed to break

13 the law, then the Plaintiffs are allowed to break the law.  Second,

14 the Plaintiffs knew that developing and operating the commercial

15 18-hole golf course in not permitted under the Zoning Ordinances.

16 Third, as stated above, permitted uses other than Agritourism may

17 exist for the Ironstone uses, and those uses are not determinative

18 of the Plaintiffs' development and use of The Property.

19    The Plaintiffs have failed to establish by a preponderance of

20 the evidence each of the independent necessary elements of

21 estoppel: that (1) the County made representations intended to

22 induce reliance by the Plaintiffs in developing an 18-hole golf

23 course, (2) the County acted in a manner causing the Plaintiffs to

24 believe that it was legal for them to construct a commercial golf

25 course on The Property, (3) that the Plaintiffs were ignorant of

26 the fact that an 18-hole commercial golf course was not a legally

27 permitted use on The Property as it was and is currently zoned, and

28 (4) that the Plaintiffs relied on the representations or acts of

60

the County in proceeding with the development of the 18-hole commercial golf course on The Property.  The request for equitable estoppel to be applied to prevent the County from enforcing the Calaveras County Zoning Ordinances as to the golf course use on The Property is denied.

### CALAVERAS COUNTY IS ENTITLED TO INJUNCTIVE RELIEF

In its Counterclaim, the County requests that the court determine that the use of The Property as a commercial golf course is a violation of Calaveras County Code § 17.18, and that such use is a public nuisance because it constitutes an actual or threatened injury to the public health, safety or welfare and interferes with the comfortable enjoyment of life or property by residents and property owners of the County.  Further, that the court issue injunctive relief ordering the Plaintiffs, and their employees, servants, and assigns, and all persons acting in concert with them to:

1.  Stop all commercial use of the golf course on The Property, including the use of the golf course with a payment for any other activity on The Property.

2.  Stop all use of the golf course by any person who has purchased a golf membership or other financial interest in The Property, or in any adjacent property owned or controlled by either Plaintiffs or relatives of Plaintiffs in exchange for the right to use the golf course.

3.  Stop any private, public, or charitable events on The Property that involve the payment of money, purchase of raffle tickets, or any other financial payment in conjunction with attending an event when the event includes the use of the golf course by attendees.

4.  Stop advertising or otherwise marking commercial use of the golf course located on The Property, including but not limited to advertising free golf when payment is made to use The Property for any permitted use under the Calaveras Zoning Ordinances.

5.  Stop using The Property for any purpose which does not comply with all applicable laws and regulations or for which all required permits and approvals have not been obtained, including but not limited to failure to comply with parking standards and event requirements.

The County further requests that the court authorize the County to abate the nuisance at the Plaintiffs' expense if the Plaintiffs have not complied within 60 days of the court's judgment for the permanent injunction. Further, that pursuant to California Civil Code § 3491 and Government Code § 54988, the County seeks an award of its costs, including but not limited to investigation and enforcement costs, costs of this Adversary Proceeding, and attorneys' fees.

A local governmental entity may invoke appropriate civil remedies to enforce its ordinances pursuant to the police power granted to it under the California Constitution. Art. XI, § 11. This includes obtaining injunctive relief to restrain the violation or to cause the wrongful effect thereof to be removed. *City of Santa Clara v. Paris*, 76 Cal. App. 3d 338, 342 (1977); *see also, Yuba City v. Cherniavsky*, 117 Cal. App. 568, 572 (1931); *Stockton v. Frisbie & Latta*, 93 Cal. App. 277, 289 (1928). As discussed by the District Court of Appeal in *San Francisco v. Burton*, 201 Cal. App. 2d 749, 757 (1962), there is no need for the governmental entity to show that a nuisance *per se* exists; the right of a governmental entity to enforce its ordinance by injunction was not open to question.

The County, by the actions of the Board of Supervisors in enacting the Zoning Ordinances, has determined what uses may be made of real property in various parts of Calaveras County. The use of The Property for a commercial golf course is not permitted

62

and is determined to improper under the zoning ordinance. The Plaintiffs have shown no basis for why or how their use of The Property as a commercial golf course does not violate the Zoning Ordinances or why they should be allowed to operate a commercial golf course in violation of the Zoning Ordinances. The 18-hole commercial golf course being operated on The Property is a public nuisance.

The court grants the request for injunctive relief and the judgment on the Counterclaim shall provide that the Plaintiffs, and each of them, and their agents, representatives, assigns, transferees and anyone asserting an interest or right from the Plaintiffs, and any entities in which the Plaintiffs have an interest, are permanently enjoined and shall, effective January 27, 2012, and continuing thereafter

   a.  Terminate and cease the use of the golf course on The Property as a commercial golf course for which payment, remuneration, credit, transfer, or anything of value is given to or for the benefit of Michael Nemee and Michelle Nemee, and each of them, and their respective family members, agents, employees, servants, representatives, and any entity in which Michael Nemee or Michelle Nemee have an ownership, equitable, or other interest, directly or indirectly, from any other person or entity for the use of said golf course.

   b.  Terminate and cease allowing the use of the golf course on The Property by any person who claims or asserts that they have purchased a golf membership, obtained any other right, or have received authorization to use the golf course for any purpose for which remuneration, credit, transfer, or anything of value is given to or for the benefit of Michael Nemee and Michelle Nemee, and each of them, and their respective family members, agents, employees, servants, representatives, and any entity in which Michael Nemee or Michelle Nemee have an ownership, equitable, or other interest, directly or indirectly.

   c.  Terminate and cease the using or allowing the use of the golf course on The Property for any private, public, or charitable events for playing golf or any golf related activity.

d.  Terminate and cease advertising or otherwise marking for commercial use the golf course located on The Property, and the use of the golf course on The Property by any person other than the Owners in exchange for payment, remuneration, credit, transfer, or anything of value is given to or for the benefit of Michael Nemee and Michelle Nemee, and each of them, and their respective family members, agents, employees, servants, representatives, and any entity in which Michael Nemee or Michelle Nemee have an ownership, equitable, or other interest, directly or indirectly, from any other person or entity for the use of the golf course.

e.  Michael Nemee and Michelle Nemee, and each of them, and their respective family members, agents, employees, servants, representatives, and any entity in which Michael Nemee or Michelle Nemee have an ownership, equitable, or other interest, shall comply with the Calaveras County Zoning Ordinances for the use of The Property, for the use and maintenance of the golf course on The Property.

Michael Nemee and Michelle Nemee, and each of them, may seek to modify this injunction to the extent that it becomes inconsistent with future amendments to the Calaveras County, California Zoning or other ordinances concerning the use of the property identified in this judgment.

The County may obtain from this court further orders for the enforcement of this injunctive relief as necessary for the abatement of the public nuisance, and seek the award of costs and expenses of such abatement, if Michael Nemee and Michelle Nemee, and each of them, and their respective family members, agents, employees, servants, representatives, and any entity in which Michael Nemee or Michelle Nemee have an ownership, equitable, or other interest, fail to comply with this injunction on or before January 27, 2012.

Further, that pursuant to California Civil Code § 3491 and Government Code § 54988, the County may file a costs bill and

1   motion for award of attorney's fees and expenses in connection with

2   enforcing the Zoning Ordinances for the conduct subject to the

3   permanent injunction, as determined reasonably and necessary by

4   this court pursuant to a post-judgment costs bill and fee

5   application filed on or before December 9, 2011.

**CONCLUSION**

7       The court shall enter judgment in favor of the Defendant

8   Calaveras County on the Seconded Amended Complaint denying all

9   relief requested by the Plaintiffs.  Further, the court shall enter

10  judgment on the Counterclaim in favor of Calaveras County and

11  against the Plaintiffs, and each of them, for a permanent

12  injunction enjoining the use of the 18-hole golf course on The

13  Property, authorizing the County to abate the continued used of the

14  18 hole golf course on The Property through the enforcement of the

15  permanent injunction issued by this court, and awards costs, fees,

16  and expenses to the County.  The permanent injunction is granted

17  based on the Calaveras County Zoning Ordinances in effect as of the

18  date of the injunction, and is subject to modification based on

19  future amendments to the Zoning Ordinances for the permitted uses

20  of The Property.

21      The court shall by supplemental order issue a draft of the

22  proposed judgment form, affording the parties to state any

23  objection to the from and content of the order, and propose any

24  corrected or additional language in writing.

25  Dated: November 21, 2011

RONALD H. SARGIS, Judge
United States Bankruptcy Court